**In re Ann A. LINN, and James P. Linn, Debtors.**

**Bankruptcy Nos. BK–88–711–TS, BK–88–712–TS.**

United States Bankruptcy Court, W.D. Oklahoma.

Sept. 5, 1989.

See also, Bkrtcy., 88 B.R. 365.

Michael P. Kirschner and Jackie L. Hill, Jr. of Hastie & Kirschner, Oklahoma City, Okl., for movant.

Michael Freeman and Mark Toffoli, Office of U.S. Trustee.

Jerry Tubb of Fuller, Tubb & Pomeroy, Oklahoma City, Okl.

Judy Morse of Crowe & Dunlevy, Steve Bugg of McAfee & Taft, Michael Rubenstein of McKinney, Stringer & Webster, Richard Labarthe of Mock, Schwabe, Waldo, Elder, Reeves & Bryant, Oklahoma City, Okl., for Official Unsecured Creditors Committee.

## ORDER REGARDING COMPENSATION OF TRUSTEE

JOHN TeSELLE, Bankruptcy Judge.

### Background

After extensive efforts were made by Ann A. Linn and James P. Linn to settle with their creditors and avoid bankruptcy, involuntary Chapter 7 bankruptcy petitions were filed against each of the Debtors on February 3, 1988. Upon Debtors' motions, both cases were converted to Chapter 11 on February 24, 1988.

The scheduled indebtedness of the two individual Debtors, most of which was joint indebtedness, exceeded $205,000,000.00.[1] Debtors' scheduled assets, many of which

---

[1]. *See* Statement of Financial Affairs For Debtor Engaged in Business, at Schedule A, filed by Ann A. Linn on March 31, 1988, in Case No. 88–711–TS, and by James P. Linn on March 17, 1988, in Case No. 88–712–TS. Not included as an asset of Ann A. Linn's bankruptcy estate is a trust fund of which she is a beneficiary.

were jointly owned, totalled more than $75,000,000.00.[2]

The substantial assets involved in these cases galvanized the creditors and their attorneys into action and thereafter, an unsecured creditors' committee was formed in each case. The law firm of Crowe & Dunlevy was initially appointed temporary counsel for both of those committees, but later withdrew. Subsequently, the law firm of McKinney, Stringer & Webster was employed to represent the unsecured creditors' committee in Mrs. Linn's case. That firm served less than twelve weeks when on August 23, 1988, Mrs. Linn converted her case to one under Chapter 7. Thereafter, on August 25, 1988, the Assistant United States Trustee (hereinafter the "AUST") appointed Mr. Ainslie Perrault, Jr., to serve as interim trustee in Mrs. Linn's case.[3]

Though much lip service was given by the parties to a "global settlement," before the conversion of Mrs. Linn's case from Chapter 11 to Chapter 7 the prospect of any kind of settlement prior to exhaustion of the estate assets appeared dismal at best. The ongoing divorce action between Debtors, and the hostility existing between Debtors and Creditors throughout the Chapter 11 proceedings served as deterrents to the resolution of these cases. Upon the appointment of Mr. Perrault as Interim Trustee, the Creditors' animosity towards Debtors shifted to and became focused upon Mr. Perrault and his counsel, and continues so to this date. However, this did not prevent Mr. Perrault from changing the whole tenor of these proceedings from one of "let's fight," to one of "let's settle." [4]

Mr. Perrault, in addition to being knowledgeable in business and the law, demonstrated a rare gift for understanding and accommodating the intricate human aspects of these cases. Though he and his appointment were constantly under attack, he never wavered or lost sight of his stated objective, which was to bring about a collective settlement by December 31, 1988.[5] On December 28, 1988, only 125 days following Mr. Perrault's appointment, the Court was presented with Compromise and Settlement Agreement providing for settlement of both cases (hereinafter the "Settlement Agreement").

These cases appear to be unique in the annals of bankruptcy lore. Never, in the memory of this Court, has an individual accomplished so much, for so many, against such great odds, in such a short time, while at the same time being subjected to such scorn by those whose clients benefitted most from his efforts.[6]

### Fee Dispute

The Settlement Agreement provides that Mr. Perrault's compensation is not to exceed $75,000.00 for services rendered through December 31, 1988. On June 20, 1989, Trustee's Application for Allowance of Compensation and Disbursements (hereinafter the "Application") was filed. The Application included a request for additional compensation for distributions made to creditors subsequent to December 31, 1988.[7]

A hearing was held on the Application on July 18, 1989. At the commencement of the hearing, Mr. Perrault agreed to limit his request for fees and expenses to a total of $150,000.00. Even then, his Application was vehemently opposed by Creditors.

---

2. *Id.* at Schedule B.

3. The James Linn bankruptcy proceeding was converted to Chapter 7 on December 28, 1988, pursuant to the terms of a settlement agreement entered that date. Upon conversion, the AUST also appointed Mr. Perrault as Interim Trustee for that case.

4. *See* Remarks of J. Tubb, Esq., Transcript of Proceedings Had on the 18th day of July, 1989, at 53–58, *In re Linn,* No. 88–711–TS (Bankr.W.D. Okla.).

5. Substantial tax benefits would be derived if a settlement could be reached before the end of the 1988 calendar year.

6. This matter brought to mind a fable which, as adapted for the occasion, is attached as an Appendix hereto.

7. Over $10,000,000.00 was distributed to creditors of the two estates during the first week of 1989.

Creditors' position was that the 1989 distributions were within the purview of the Settlement Agreement. At the conclusion of the hearing, the Court took the matter under advisement.

The Court's preparation of its decision was halted when it learned a settlement of the fee dispute was likely. Thereafter, on August 25, 1989, the parties entered into a Stipulation Regarding Trustee's Application for Allowance of Compensation and Reimbursement of Expenses (hereinafter the "Stipulation"). The Stipulation was submitted to the Court, together with a proposed agreed order. While the Court normally welcomes and encourages the parties to enter into and submit to the Court agreed proposed orders, the Court is of the opinion this matter deserves a more thorough treatment than that provided by the parties' abbreviated proposed order.

## Commendations

The Stipulation having resolved the monetary aspects of the pending fee dispute, the Court is no longer called upon to decide the merits of that dispute. However, in view of the fact these bankruptcy proceedings are nearing conclusion, the Court would be remiss in not commending all the parties for having reached, in record time, a comprehensive settlement of these very difficult Chapter 7 bankruptcy cases.

The Court is aware that no settlement of this magnitude is achieved by one person alone. The collective efforts of numerous parties, many of whom are unknown to this Court, made this settlement possible. The following persons are among those whose efforts have come directly to the attention of the Court. No doubt there are others, including some in Dallas, whose efforts are not known to the Court, but who also warrant acknowledgement.

Mr. Michael Freeman, the AUST for this District, has been the object of much unwarranted criticism in these Chapter 7 cases. Such criticism was initially directed at his appointment of Mr. Perrault as Interim Trustee in Mrs. Linn's Chapter 7 case. He was further criticized for contesting the validity of many of the Creditors' ballots cast in an attempted election of a trustee conducted at the First Meeting of Creditors in Mrs. Linn's Chapter 7 proceeding.

It should be noted, though, that had Mr. Freeman not recognized the rare combination of attributes possessed by Mr. Perrault, caused him to be added to the Chapter 7 panel of trustees,[8] and resisted the acrimonious desires of Creditors to turn these proceedings into a battle ground, Mr. Perrault would not have been appointed or been permitted to continue to serve as Trustee in these cases. Without Mr. Perrault's guidance, the comprehensive settlement achieved in these cases would likely not have occurred. It is the opinion of the Court that Mr. Freeman performed his duties as AUST in these Chapter 7 proceedings in an exemplary manner.

The efforts of Ms. Judy Morse, on behalf of the Creditors, and particularly her heroic efforts during the month of December 1988, are especially commendable. Her long and often late hours of diligent, effective efforts made the timely settlement of these cases possible.

Though plagued with serious conflicts when he entered these proceedings, Mr. Mike Kirschner, as counsel for Trustee, through his patience and unrelenting efforts, also contributed to the successful conclusion of these cases.

The willingness of Mr. Jerry Tubb[9] to provide the Court with his perspective of the events leading up to the Settlement

---

**8.** Counsel for FDIC and Seattle First National Bank states she was advised by the United States Trustee's office in Wichita, Kansas, that Mr. Perrault had never been appointed to the panel of Chapter 7 Trustees in this District. *See* **Supplement to Objection to Fee Application of Ainslie Perrault, Jr.,** at 17 (filed August 7, 1989). The Wichita office of the United States Trustee appears not to have been informed of a letter of August 17, 1988, addressed to Mr. Perrault, wherein Mr. Thomas J. Stanton, Director

of the United States Trustee Program, acknowledged Mr. Perrault's appointment as a panel trustee.

**9.** As counsel for Mr. Linn, Mr. Tubb has perhaps the longest tenure of any attorney participating in these proceedings. He took an active part in the pre-bankruptcy negotiations, and has continued to represent Mr. Linn throughout these proceedings.

Agreement is commendable. Mr. Tubb's comments were enlightening and greatly appreciated by the Court, especially in view of the hostile environment that existed at the time of the hearing on Mr. Perrault's fees. His remarks brought an objective breath of fresh air to a hearing which otherwise appeared to be permeated with vindictiveness.

### Decision

The parties having entered into and presented the Court with the Stipulation in which Mr. Perrault agreed to limit his fees and expenses to $122,500.00, the Court is constrained from awarding him a greater sum. However, the Court notes this amount is not commensurate with the fees and expenses the Settlement Agreement provides other attorneys whose efforts appear to have contributed less to the successful resolution of these cases.[10]

Accordingly, the sum of $122,500.00 is awarded to Mr. Ainslie Perrault, Jr., as compensation for services rendered and expenses incurred in connection with his outstanding and highly successful administration of these bankruptcy estates.

IT IS SO ORDERED.

### APPENDIX

### A Fable

Once upon a time there were angry Lenders who went to the Winds and said, "Lady and her husband borrowed a lot of money from us and have not paid us back. Lady is now walking around in an expensive fur coat and we want the coat. Will you get it for us?" The Winds replied, "Certainly, but please understand it may take many, many hours and we expect to be paid handsomely for the time it takes." Lenders replied, "We understand, but we want the coat."

The Winds observed Lady wearing her fur coat and began huffing and puffing in an attempt to blow her coat off, which only caused her to hold the coat closer. The Winds responded by blowing even harder. Soon the sand was swirling and debris was flying, causing Lady to clutch her coat still tighter.

The skies grew dark and threatening, causing Lady to seek refuge in a nearby courthouse. This infuriated the Winds and every day thereafter when the Winds saw Lady, they would again blow with great ferocity and Lady would grasp her coat even more tightly.

When it became apparent that a stalemate had resulted, along came the Queen's Assistant who said to the Winds, "I have asked Sun to help retrieve the coat for Lenders and Sun has agreed to do so." The Winds only smirked and said, "We don't want Sun's help. All Sun can do is shine. What is needed is a more dynamic force. We want to enlist the aid of a Texas Tornado." The Queen's Assistant responded, "That could result in the coat being damaged and becoming worthless. Also, would that not be at great expense to Lenders?" To this the Winds responded, "So be it! What is important is that we take the coat from Lady, even if it costs all the coat would bring." The Queen's Assistant then said, "I contest the use of a Texas Tornado, and will continue to do so, until Sun has been given a chance to get the coat." The Winds then departed uttering profanities at Sun and the Queen's Assistant.

Sun sought out Lady and began to shine warmly upon her. Feeling Sun's warmth radiating upon her, Lady loosened her grip on the coat. Observing this, the Winds yelled to the Queen's Assistant, "Quickly, this is our chance, let us call in a Texas Tornado." The Queen's Assistant responded, "Not yet," and Sun continued to shine.

---

10. Counsel for Mrs. Linn was awarded fees and expenses in the amount of $280,624.00 (reduced from $320,624.14 by the Settlement Agreement). Permanent counsel for the Unsecured Creditors' Committee in Mrs. Linn's case was awarded fees and expenses in the amount of $124,226.00 for the less than three month period served. The Settlement Agreement virtually assured counsel would receive the full amount for which applied, even though the fee application was actively under review by the Court at the time.

Soon Lady took off her coat. At this point, Sun said to her, "I know you are fond of your coat and do not want to part with it, but would you give it up if assured the Winds will never endanger you again?" Lady replied, "I trust you, so if you assure me I will never have reason to fear the Winds again, I will surrender the coat to you." Receiving such assurance from Sun, Lady gave the coat to the great shining light.

Sun then delivered the coat to Lenders, saying, "Here is the coat you sought. Am I not entitled to be rewarded?" Lenders' reply was "What did you do? You didn't huff and puff and cause Lady great discomfort. She voluntarily surrendered the coat to you. All you did was shine on Lady and deliver the coat to us. For the little you did you are entitled to a mere pittance. Besides, we didn't want you interfering anyway. Had it not been for the Queen's Assistant, we could have called in a Texas Tornado and not have had to put up with you. Here is your pittance, now return from whence you came." "Yes," joined in the Winds, "You deserve not a penny more. Surely you can't believe the brief time you spent shining is worth as much or more than all the time we spent huffing and puffing."

Sun sadly departed feeling unappreciated and cheated, but with the satisfaction of having accomplished in so short a time what, after the expenditure of many hours and at great expense to Lenders, the Winds had failed to achieve.

The End.